## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | | |
|---|---|---|
| LAURA A. OWENS, | : | |
| individually and on behalf of a | : | |
| class of all others similarly situated, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Complaint-Class Action |
| v. | : | |
| | : | Civil Action No. <u>2:14-CV-00074</u> |
| METROPOLITAN LIFE | : | |
| INSURANCE COMPANY, | : | |
| | : | |
| Defendant. | : | |

Plaintiff Laura A. Owens ("Ms. Owens"), brings this action on behalf of herself and a class and subclass of similarly situated individuals, against Defendant Metropolitan Life Insurance Company ("MetLife"), showing the Court the following:

### INTRODUCTION

1.     This action involves claims brought pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et. seq.* ("ERISA").  This case addresses MetLife's practice of borrowing life insurance death benefits that are ERISA plan assets and investing these funds for its own account. MetLife acquires possession of these funds in the course of fiduciary service to ERISA-governed employee benefit plans.  MetLife retains the profit flowing from the investments, with

its debts to plan beneficiaries evidenced not by notes or traditional security instruments but by books of blank drafts that can be used by beneficiaries to draw on unfunded "accounts" at a clearing bank.  It is a procedure used by MetLife and other life insurance carriers that the insurance industry calls "retained asset accounts," though others, including the United States Court of Appeals for the First Circuit, label as "no more than an IOU."

2.     MetLife's conversion of ERISA plan death benefits violates ERISA because MetLife is a fiduciary and a party in interest as defined by 29 U.S.C. §§ 1002(14), (21), and the self-dealing inherent in its practices violates the duty of loyalty that ERISA imposes upon fiduciaries and violates several of ERISA's prohibited transaction rules.

## PARTIES, JURISDICTION AND VENUE

3.     Ms. Owens is a resident and citizen of the State of Georgia.  She resides at 99 Canada Lane, Cleveland, Georgia 30528-4633, in the Gainesville Division of this Court.

4.     MetLife transacts business, through its agents and employees, in the Gainesville Division of the United States District Court for the Northern District of Georgia. MetLife has offices and agents in the Gainesville Division of this Court,

including, *inter alia*, offices at 3750 Agard Street, Cumming, Georgia 30040, and 124 Courtland Drive, Jefferson, Georgia 30549.  MetLife is registered to do business in the State of Georgia and may be served with process by service upon its registered agent, CT Corporation System, 1201 Peachtree Street, N.E., Atlanta, GA 30361.  MetLife is subject to the jurisdiction of this Court.

5.   MetLife is incorporated under the laws of the State of New York with its principal place of business in New York City, New York.  The amount in controversy in this action far exceeds $5,000,000.00.  Ms. Owens, most members of the Georgia Subclass and many members of the Class for whom this action is brought are citizens of states other than New York.  This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d).  This Court also has subject matter jurisdiction pursuant to ERISA § 502(e)(1), 29 U.S.C.§ 1132(e)(1) and 28 U.S.C. § 1331, because this action involves claims brought by beneficiaries pursuant to ERISA § 502(a)(3), 29 U.S.C. §1132(a)(3) to obtain appropriate equitable relief to redress MetLife's violations of ERISA's fiduciary standards and prohibited transaction rules.

6.   Venue lies in the Gainesville Division of this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because, among other things, MetLife may be found within the district, as it has offices and agents in the Gainesville Division.

## METLIFE'S HANDLING OF

## MS. OWENS' LIFE INSURANCE CLAIM

7.     Ms. Owens' husband Robert F. Owens was a resident of Georgia, employed by CB Richard Ellis, Inc., with his office in this district, and was a participant in the CB Richard Ellis Group Insurance Plan ("Plan") from September 12, 2005 until his death on April 7, 2012.  Ms. Owens requested a copy of the Policy from CB Richard Ellis, Inc. and received the Certificates of Insurance that are attached to her Administrative Claim letter dated November 21, 2013, which is attached as Exhibit "A" to this Complaint.

8.     The Plan provides life insurance benefits through an insurance policy issued by MetLife ("Policy").

9.     The Plan and Policy provided $95,000 in Basic Life coverage on Mr. Owens' life.  Ms. Owens is the beneficiary of that coverage.

10.     The Policy's payment clause provides "We will pay the Life Insurance in one sum.  Other modes of payment may be available upon request."[1]

11.     CB Richard Ellis submitted a claim for life insurance benefits to Metlife

---

[1] The payment clause is found on page 21 of the first certificate and on page 24 of the second certificate.

on Ms. Owens' behalf on or about May 21, 2012.

12.     MetLife approved the claim, but did not pay the life insurance benefits to Ms. Owens in one sum or give Ms. Owens any choice concerning the mode of payment. Instead, MetLife informed Ms. Owens that her life insurance proceeds had been "paid" to her through the "Total Control Account (TCA) Settlement Option" ("TCA"), and issued her a book of blank drafts that she could use to draw on the funds in increments of $250 or more.  By doing so, MetLife exercised its control over the ERISA plan benefits due Ms. Owens and loaned those death benefits to itself, holding Ms. Owens' death benefits in its general account.

13.     MetLife set the interest rate that it would accrue on the debt it owed Ms. Owens at a rate that would float weekly to equal or exceed one of two indices, but with the annual effective interest rate no lower than 0.50%.

14.     MetLife reserved the right to unilaterally change the terms governing the debt it owed to Ms. Owens, except for the minimum rate, beginning six (6) months after the debt was incurred.

15.     When MetLife lends to itself the death benefits due its beneficiary, it holds the beneficiary's death benefits in its general account until it is called upon by the bank that provides draft-clearing services for MetLife to transfer funds to that

bank to cover drafts drawn on the unfunded "Total Control Account." In the interim, MetLife invests the beneficiary's funds and keeps for itself the difference or "spread" between the amount it accrues by self-dealing in its beneficiary's funds and the amount of interest it credits to its beneficiary.

16.     MetLife credited interest on the unpaid death benefits owed to Ms. Owens at the rate of .50%.  Upon information and belief, MetLife gained far more than 0.50% by investing Ms. Owens' life insurance benefits for its own account.

17.     Metlife did not disclose to Ms. Owens the amount of profit that it reaped from the spread between the amount it gained by investing her benefits for its own account and the amount of interest it credited to her.

18.     Upon information and belief, MetLife did not disclose to the Plan's sponsor or administrator the profits that it expected to accrue and did accrue from the spread between the amount it gained investing Ms. Owens' benefits and the benefits of other Plan beneficiaries for its own account and the amount of interest it credited to the ERISA plan beneficiaries on the unpaid death benefits that it owed to them.

## METLIFE'S PRACTICES GENERALLY

19.     At all times relevant to this action, MetLife sold group life insurance policies ("Policies") similar to the Policy that it sold to the Plan to other ERISA-governed employee welfare benefit plans ("Plans").

20.     The payment clauses in these Policies provide "We will pay the Life Insurance in one sum.  Other modes of payment may be available upon request."

21.     When MetLife approves claims for death benefits due under these Policies in amounts that exceed a certain threshold, MetLife does not pay the benefits in one sum or give the beneficiaries any choice concerning the mode of payment. Instead, MetLife loans the plan benefits to itself and handles their claims in the same way that it handled Ms. Owens' claim.

22.     When MetLife loans the ERISA plan death benefits to itself, it holds these borrowed funds in its general account until it is called upon by the bank that provides draft-clearing services for MetLife to transfer funds to the bank to cover drafts drawn on the debts it owes to ERISA plan beneficiaries.  In the interim, MetLife invests the beneficiaries' funds and keeps for itself the spread between the amount it gains by investing the beneficiaries' funds and the amount of interest it credits to the beneficiaries.

23.     Upon information and belief, MetLife does not disclose to the Plans' sponsors, administrators or beneficiaries the amount of profit it realizes from its investments of funds that it owes ERISA plan beneficiaries, nor does it negotiate with the Plans in advance as to the amount of profit that it will retain.

24.     MetLife's practice of lending to itself death benefits due ERISA plan beneficiaries, with an empty interest-bearing "account" established for the beneficiary at a bank and the beneficiary being issued a book of blank drafts with which to draw on the claim proceeds through the "account" is a practice that was devised by a former MetLife executive named Gerry Goldsholle in order to allow MetLife to "hold onto death benefits" that it otherwise would have to pay out so that MetLife could continue to invest the funds for its own enrichment and "make a nice spread on the money":

> "I looked at this and said this is crazy," says Goldsholle...."What are we doing to retain some of this money? It's very expensive to bring money in the front door of an insurance company. You're paying very large commissions and sales expenses."
>
> So ... [he] came up with a way for MetLife to hold onto death benefits.
>
> "The company would win because we would make a nice spread on the money," Goldsholle says, while customers would earn interest on their accounts. MetLife, he says, can earn 1 to 3 percentage points more from its investment income – mostly from bonds – than it pays out to

survivors.[2]

25.     This practice by which MetLife lends plan assets due beneficiaries to itself is profitable for MetLife.   According to Goldsholle, "MetLife makes $100 million to $300 million a year from investment returns on the death benefits it holds." *Id.*

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

26.     On November 21, 2013, Ms. Owens submitted the claim attached hereto as Exhibit "A"  to MetLife via overnight mail.

27.     The ERISA addenda  to the Plan's Certificates  of Insurance state that MetLife will review claims and notify claimants of its decision on their claims within a reasonable period, not to exceed 90 days from the date MetLife receives the claim, unless MetLife notifies the claimant that there are special circumstances requiring an extension of time of up to an additional 90 days.

28.     As of  today's date, MetLife has  neither notified  Ms. Owens of  its decision on her claim nor requested additional time to respond to the claim.

---

[2] David Evans, *Fallen Soldiers' Families Denied Cash as Insurers Profit*, Bloomberg News, July 28, 2010, available at http://www.bloomberg.com/news/2010-07-28/fallen-soldiers-families-denied-cash-payout-as-life-insurers-boost-profit.html.

## METLIFE'S FIDUCIARY STATUS

29.    Under ERISA § 3(21)(A), a person is a fiduciary with respect to a plan to the extent:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A)(i), (iii).

30.    The actions subject to complaint in this case include MetLife's decision to lend ERISA plan death benefits to itself, memorializing these debts with an unfunded account that it euphemistically calls a "Total Control Account" instead of paying to beneficiaries their death benefits in one sum, and MetLife's decisions to invest the beneficiaries' benefits for its own account and keep for itself most of the resulting gain.

31.    MetLife functioned as a fiduciary when it took the actions subject to complaint for three independent reasons.

32.    First, MetLife had discretionary authority to take the actions pursuant to the terms of its Policy, which gave MetLife "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in

accordance with the terms of the Plan[,]" thus rendering MetLife a fiduciary under ERISA § 3(21)(A)(iii).

33.     Second, MetLife exercised discretionary authority and control in the management of the Plans when it took the actions subject to complaint because the actions were not compelled by the terms of the Policies, thus rendering MetLife a fiduciary under the first clause of subsection (i) of ERISA § 3(21)(A).

34.     Third, the Policies and the death benefits provided by the Policies are assets of the Plans, and MetLife exercised authority and control over these assets when it took the actions subject to complaint, thus rendering MetLife a fiduciary with respect to the actions pursuant to the second clause of subsection (i) of ERISA § 3(21)(A).

## METLIFE'S STATUS AS A PARTY IN INTEREST

35.     "The term 'party in interest' means as to an employee benefit plan – (A) any fiduciary ... [and] (B) a person providing services to such plan[.] ERISA § 3(14), 29 U.S.C. § 1002(14).

36.     MetLife is a party in interest pursuant to subsection (A) because it is a fiduciary for the reasons stated above.

37.     MetLife is a party in interest pursuant to subsection (B) because it

provided services to the Plans by, *inter alia*, issuing the Policies to the Plans and

administering claims due under the Policies.

## CLASS ACTION ALLEGATIONS

38.   Ms. Owens brings this action as a class action on behalf of herself and

all members of a class that includes:

> All life insurance beneficiaries of ERISA-governed employee benefit
> plans that are insured by group life insurance policies issued by MetLife
> that provide for payment in "one sum" for whom MetLife established a
> "Total Control Account" between April 16, 2008, and the date when the
> Court decides Ms. Owens' motion for class certification.

> This class is referred to as the Class.

39.   Ms. Owens further brings this action on behalf of a subclass that includes:

> All members of the Class as defined above who were residents of the
> State of Georgia at the time of their decedent's death or are the
> beneficiaries of insureds who were residents of the State of Georgia at
> the time of their death.

> This subclass is referred to as the Georgia Subclass.

40.   **Numerosity**.  Upon information and belief, the Class includes tens of

thousands of members and the Subclass includes at least one thousand members.

Joinder of all class members is impractical.

41.   **Commonality.**  There are questions of law and fact common to the Class

and the Subclass, including without limitation:

a. Whether MetLife engaged in the actions subject to complaint;

b. Whether MetLife was functioning as a fiduciary under ERISA § 3(21)(A) when it engaged in the actions subject to complaint;

c. Whether MetLife is a "party in interest" within the meaning of ERISA § 3(14);

d. Whether the actions subject to complaint violate ERISA §§ 404(a)(1)(A), 406(a)(1)(B), 406(a)(1)(C), and/or 406(b)(1);

e. The amount by which MetLife was unjustly enriched through the actions subject to complaint;

f. The equitable relief that is appropriate to redress the actions subject to complaint, including whether MetLife should be ordered to disgorge the profits it has reaped through those actions; and

g. As to the Georgia Subclass, there are additional common issues as to whether the retained death benefits are protected under the Georgia Life and Health Insurance Guaranty Association statute and whether the retained death benefits accrue interest at the rate set by the Georgia post-mortem interest statutes.

42. **Typicality.** Ms. Owens' claim is typical of the claims of the members

-13-

of the Class and the Georgia Subclass.  All of the claims are based on the same facts, practices and legal theories.

43.    **Adequacy of Representation.**  Ms. Owens and her counsel will fairly and adequately represent the interests of the members of the Class and the Georgia Subclass.  Ms. Owens does not have any interests that conflict with the interests of the members of the Class and the Georgia Subclass, and her attorneys possess the experience, expertise and resources necessary to prosecute this action as a class action.

44.    **Predominance.** The questions of law and fact common to class members predominate over any questions affecting only individual class members.

45.    **Superiority.**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy in this case, considering: (a) prosecution of separate actions by individual class members would not be efficient or economically feasible due to the modest amount in controversy for individual class members; (b) the absence of any other pending litigation involving the claims asserted in this action; (c) the desirability of concentrating this action in this forum; and (d) the absence of any foreseeable difficulties in managing this action as a class action.

## COUNT 1

## VIOLATION OF ERISA § 404(a)(1)(A)

46.     Paragraphs one through forty-five are realleged and incorporated into Count 1.

47.     ERISA § 404(a)(1)(A) requires ERISA fiduciaries to discharge their duties with respect to ERISA plans "solely in the interests of the participants and beneficiaries" and "for the exclusive purpose of providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1)(A). The duty of loyalty imposed by this provision is the highest known to law.

48.     MetLife breached its duty of loyalty to Ms. Owens and members of the Class by borrowing their benefits, investing the funds for its own account, and keeping for itself most of the resulting gain.

49.     As a direct and proximate result of MetLife's disloyalty, MetLife has been unjustly enriched in an amount equal to all profit obtained by MetLife on the borrowed death benefits.

50.     Ms. Owens and all members of the Class are entitled to surcharge in equity compelling MetLife to disgorge all profit it realized from self-dealing in their death benefits.

51.     Ms. Owens and all members of the Class are entitled to recover expenses of litigation, including reasonable attorney fees.

52.     Ms. Owens and all members of the Class are entitled to prejudgment interest on the funds subject to disgorgement.

## COUNT 2

## VIOLATION OF ERISA § 406(b)(1)

53.     Paragraphs one through forty-five are realleged and incorporated into Count 2.

54.     ERISA § 406(b)(1) prohibits ERISA fiduciaries from dealing with the assets of ERISA plans in their own interest or for their own account. 29 U.S.C. § 1106(b)(1).

55.     Pursuant to ERISA § 401(b)(2), 29 U.S.C. § 1101(b)(2), the Policies purchased by the Plans are assets of the Plans or "Plan Assets."

56.     The death benefit proceeds of the Policies are Plan Assets until actual possession of the proceeds is transferred by MetLife to the beneficiary or the beneficiary's payee.

57.     MetLife dealt with the Policies and the death benefit proceeds of the Policies in its own interest and for its own account by lending to itself the benefits it

owed Ms. Owens and members of the Class, investing the retained funds for its own account, and keeping for itself the resulting profits.

58.     Ms. Owens and all members of the Class are entitled to surcharge in equity compelling MetLife to disgorge all profit it realized from self-dealing in their death benefits.

59.     Ms. Owens and all members of the Class are entitled to recover expenses of litigation, including reasonable attorney fees.

60.     Ms. Owens and all members of the Class are entitled to prejudgment interest on the funds subject to disgorgement.

## COUNT 3

## VIOLATION OF ERISA § 406(a)(1)(B)

61.     Paragraphs one through forty-five are realleged and incorporated into Count 3.

62.     ERISA § 406(a)(1)(B) provides:

**§ 1106. Prohibited transactions**

**(a) Transactions between plan and party in interest**

Except as provided in section 1108 of this title:

       (1) A fiduciary with respect to a plan shall not cause the plan to

engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect--

    (B) lending of money or other extension of credit between the plan and a party in interest;

29 U.S.C. § 1106(a)(1)(B).

63.    Pursuant to ERISA § 401(b)(2), 29 U.S.C. § 1101(b)(2), the Policies purchased by the Plans are assets of the Plans or "Plan Assets."

64.    The proceeds of the Policies are Plan Assets until actual possession of the proceeds is transferred to the beneficiary or the beneficiary's payee.

65.    MetLife used its power as a plan fiduciary and as a party in interest to take the plan assets generated to pay death benefits and to lend these plan assets to itself, thereby becoming a debtor of the plan beneficiaries.  In doing so, MetLife engaged in transactions prohibited by 29 U.S.C. § 1106(a)(1)(B).

66.    MetLife had been unjustly enriched by its violations of 29 U.S.C. § 1106(a)(1)(B) in an amount equal to all profit that it has realized from its investment of these plan benefits that it lent to itself.

67.    Ms. Owens and all members of the Class are entitled to surcharge in equity compelling MetLife to disgorge all profit it realized from self-dealing in their death benefits.

68.     Ms. Owens and all members of the Class are entitled to recover expenses of litigation, including reasonable attorney fees.

69.     Ms. Owens and all members of the Class are entitled to prejudgment interest on the funds subject to disgorgement.

## COUNT 4

## VIOLATION OF ERISA § 406(a)(1)(C)

70.     Paragraphs one through forty-five are realleged and incorporated into Count 4.

71.     ERISA § 406(a)(1)(C) provides:

Except as provided in section 1108 of this title: (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect– ... (C) furnishing of ... services ... between the plan and a party in interest.

ERISA § 406(a)(1)(C); 29 U.S.C. § 1106(a)(1)(C).

72.     ERISA § 408(b)(2) provides relief from the foregoing prohibition for service contracts or arrangements between a plan and a party in interest if the contract or arrangement is reasonable, the services are necessary for the establishment and operation of the plan, and no more than reasonable compensation is paid for the services. 29 U.S.C. § 1108(b)(2).

73. MetLife furnished services to the Plans, including insuring the Plans' obligations to provide life insurance benefits to qualified beneficiaries and administering claims for death benefits due under the Plans.

74. The transactions in which MetLife agreed to furnish services to the Plans are prohibited by ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), unless they are exempt under ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2).

75. The transactions are not exempt under ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2) because MetLife received more than reasonable compensation for its services through its self-dealing in the death benefits of ERISA plan beneficiaries.

76. MetLife received more than reasonable compensation for its services because: (a) it controlled how much compensation it would receive from its investment of death benefits *via* its control over how the funds it retained were invested and how the resulting earnings were apportioned between itself and the beneficiaries, and (b) upon information and belief, the income that MetLife derived from the spread was not disclosed to, negotiated with, or approved by, responsible plan fiduciaries.

77. Ms. Owens and all members of the Class are entitled to surcharge in equity compelling MetLife to disgorge all profit it realized from self-dealing in their

death benefits.

78.     Ms. Owens and all members of the Class are entitled to recover expenses of litigation, including reasonable attorney fees.

79.     Ms. Owens and all members of the Class are entitled to prejudgment interest on the funds subject to disgorgement.

## COUNT 5

## DECLARATORY RELIEF FOR THE GEORGIA SUBCLASS

80.     Paragraphs one through forty-five are realleged and incorporated into Count 5.

81.     MetLife mails to members of the Class written materials asserting that the money that it owes them is covered by state insurance guaranty funds should MetLife default on its unsecured obligations to them.

82.     A "Total Control Account" is not an insurance policy.

83.     A "Total Control Account" is not an annuity.

84.     A "Total Control Account" is not a contract entered into between MetLife and its beneficiaries.

85.     A "Total Control Account" is not a supplemental contract that MetLife has submitted to the Insurance Commissioner for the State of Georgia.

86.     A "Total Control Account" is not a supplemental contract that MetLife has submitted to the Department of Financial Services for the State of New York.

87.     MetLife's "Total Control Account" is not a supplemental insurance contract approved by the Insurance Commissioner for the State of Georgia.

88.     MetLife's "Total Control Account" is not a supplemental insurance contract approved by the Department of Financial Services for the State of New York.

89.     The written materials that MetLife mails to class members following MetLife's decision to lend the death benefits to itself are mere marketing materials.

90.     The provisions of the Georgia Life and Health Insurance Guaranty Association are set forth in O.C.G.A. § 33-38-1, *et seq.*

91.     The purpose of the Georgia Life and Health Insurance Guaranty Association is to provide limited coverage to beneficiaries of life insurance and other designated types of insurance whose benefits are not paid because of the insolvency of their insurance company.

92.     The Georgia Life and Health Insurance Guaranty Association does not provide any coverage for general creditors of an insolvent insurance company.

93.     No provision of the Georgia Life and Health Insurance Guaranty Association statute provides for coverage of debts of an insolvent insurance company

memorialized by documents labeling the debt as a retained asset account.

93.    The Georgia statute provides:

**§ 33-38-2. Scope**

(c) This chapter shall not provide coverage to:

.   .   .

(13) An obligation that does not arise under the express written terms of the policy or contract issued by the insurer to the contract owner or policy owner, including without limitation:

(A) Claims based on marketing materials;

(B) Claims based on side letters, riders, or other documents that were issued by the insurer without meeting applicable policy form filing or approval requirements;

(C) Misrepresentations of or regarding policy benefits;

(D) Extra-contractual claims; or

(E) A claim for penalties or consequential or incidental damages;

O.C.G.A. § 33-38-2(c)(13).

94.    The members of the Georgia Subclass are in a position of insecurity and uncertainty as to whether their unpaid life insurance death benefits memorialized by MetLife's mailings for its "Total Control Account" are, or are not, unpaid life insurance benefits covered in case of default under the Georgia Life and Health Insurance Guaranty Association.

95.    The members of the Georgia Subclass are entitled to a declaratory judgment declaring whether ERISA plan assets that MetLife lends to itself and labels as Total Control Accounts are, in case of default, covered by the Georgia Life and Health Insurance Guaranty Association.

## COUNT 6

## POSTMORTEM INTEREST FOR THE GEORGIA SUBCLASS

96.    Paragraphs one through forty-five are realleged and incorporated into Count 5.

97.    Georgia's statute for interest due on unpaid, uncontested life insurance benefits provides in pertinent part:

**§ 33-25-10. Interest on proceeds or payments**

(a) Each insurer admitted to transact life insurance in this state shall pay interest on proceeds or payments under any individual policy of life insurance, payable to a beneficiary residing in this state or to a beneficiary under a policy issued in this state or to a beneficiary under a policy insuring a person resident in this state at the time of death.

(b) Interest payable pursuant to subsection (a) of this Code section shall be computed from the insured's death until the date of payment and shall be at the following rate of interest:

(1) In the event an action to recover the proceeds due under such policy is commenced and results in a judgment against the insurer, interest shall be computed at the legal rate of interest; or

(2) In the event no such action has been commenced, interest shall be computed daily at the greater of the rate of 6 percent per annum or the highest interest rate currently paid by the insurer on proceeds left under an interest settlement option; provided, however, that when a claim for the policy proceeds is filed with the insurer, interest shall be computed daily from 30 days after the date the claim is filed until the date of payment at the rate of 12 percent.

.   .   .

(d) For the purposes of this Code section, payment shall be deemed to have been received by a resident when manually delivered by an agent or representative of the insuring company or when deposited by the insuring company in the United States mail, postage prepaid, and directed to the resident at his last known address as evidenced by the business records of the insuring company.

O.C.G.A. § 33-25-10(a),(b),(d).

98.     The above provisions for payment of interest at the rate of twelve percent per annum on unpaid death benefits due under policies of life insurance that remain unpaid for more than thirty days apply to unpaid death benefits under group life policies.  Georgia law provides:

**§ 33-27-4. Interest**

Each insurer admitted to transact life insurance in this state shall pay interest on proceeds or payments under any policy of group life insurance payable to a beneficiary residing in this state, to a beneficiary under a policy issued in this state, or to a beneficiary under a policy insuring a person resident in this state at the time of death, in accordance with Code Section 33-25-10.

O.C.G.A. 33-27-4.

99.     MetLife's practice of lending ERISA plan benefits to itself and mailing blank drafts and marketing materials to the designated beneficiaries does not constitute payment of death benefits due under a group life insurance policy.

100.    The members of the Georgia Subclass are entitled to recover from MetLife post mortem interest at twelve percent per annum, commencing thirty days following submission of claim forms and continuing until all death benefits have been received by each beneficiary.

## PRAYER FOR RELIEF

WHEREFORE, having stated her Complaint, Ms. Owens prays as follows:

a)      that process issue and that MetLife be served with process in accordance with applicable law;

b)      that the case be certified to proceed as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), and that Ms. Owens and her attorneys be appointed to represent the Class and the Georgia Subclass as certified by the Court;

c)      that the Court inquire into this matter and find that MetLife has violated ERISA in the ways alleged by Ms. Owens and has been unjustly enriched thereby;

d)      that the Court award Ms. Owens, the Class and the Georgia Subclass appropriate equitable relief to redress MetLife's violations of ERISA, including disgorgement of the profits that MetLife reaped through the violations;

e)      that the Court declare whether death benefits due members of the Georgia Subclass are covered in case of default by the Georgia Life and Health Insurance Guaranty Association;

f)      that the Georgia Subclass recover postmortem interest as provided by Georgia law;

g)      that Ms. Owens, the Class and the Georgia Subclass recover prejudgment and post-judgment interest at the maximum rates permissible at law or in equity;

h)      that Ms. Owens, the Class and the Georgia Subclass recover attorney's fees, costs and other recoverable expenses of litigation;

i)      that Ms. Owens, the Class and the Georgia Subclass recover such other and further relief that the Court deems appropriate.

## NOTICE PURSUANT TO ERISA § 502(h)

In accordance with ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that a true and correct copy of this Complaint is being served upon the

Secretary of Labor and the Secretary of Treasury via certified mail, return receipt requested.

Respectfully submitted,


  *s/ John C. Bell, Jr.*
John C. Bell, Jr.
Georgia Bar No.  048600


  *s/ Lee W. Brigham*
Lee W. Brigham
Georgia Bar No.  081698
BELL & BRIGHAM
Post Office Box 1547
Augusta, Georgia 30903-1547
(706) 722-2014 p
(706) 722-7552 f
john@bellbrigham.com
lee@bellbrigham.com

Wm. Gregory Dobson
Georgia Bar No. 237770
LOBER DOBSON & DESAI, LLC
830 Mulberry Street, Suite 201
Macon, GA 31201
(478) 745-7700 p
(478) 745-4888 f
wgd@lddlawyers.com

Michael J. Lober
Georgia Bar No. 455580
LOBER DOBSON & DESAI, LLC
3140 Overland Drive
Roswell, GA 30075
(678) 461-9800 p
(678) 461-9944 f
mjlober@bglawgroup.net

John W. Oxendine
Georgia Bar No. 558155
4370 Peachtree Road, NE
Atlanta, GA 30319
(404) 734-5738 p
jwolaw@gmail.com

Todd L. Lord
Georgia Bar No. 457855
PO Box 901
Cleveland, GA 30528
(706) 219-2239 p
(706) 348-8200 f
attytllord@windstream.net

COUNSEL FOR PLAINTIFFS