FILED IN CLERK'S OFFICE
U.S.D.C. - Gainesville

**JUL 2 9 2019**

JAMES N. HATTEN, Clerk
By: ⟋⟍⟍   Deputy Clerk

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | | |
|---|---|---|
| LAURA A. OWENS and<br>JOSHUA R. SMITH, individually<br>and on behalf of two classes<br>of others similarly situated, | : <br> : <br> : <br> : <br> : | |
| Plaintiffs, | : <br> : | Civil Action File<br>No. 2:14-CV-00074 |
| v. | : <br> : | |
| METROPOLITAN LIFE<br>INSURANCE COMPANY, | : <br> : <br> : | |
| Defendant. | : | |

### FIRST AMENDED COMPLAINT - CLASS ACTION

Plaintiffs Laura A. Owens ("Ms. Owens") and Joshua R. Smith ("Mr. Smith") bring this action on behalf of themselves and two classes of similarly situated individuals against Defendant Metropolitan Life Insurance Company ("MetLife"), showing the Court the following:

### INTRODUCTION

1.      This action involves claims brought pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et. seq.* ("ERISA"). This case addresses MetLife's practice of borrowing life insurance death benefits that are ERISA plan assets and investing these funds for its own account. MetLife

acquires possession of these funds in the course of fiduciary service to ERISA-governed employee benefit plans.  MetLife retains the profit flowing from the investments, with its debts to plan beneficiaries evidenced not by notes or traditional security instruments but by books of blank drafts that can be used by beneficiaries to draw on unfunded "accounts" at a clearing bank.  It is a procedure used by MetLife and other life insurance carriers that the insurance industry calls "retained asset accounts," though others, including the United States Court of Appeals for the First Circuit, label as "no more than an IOU."

2.      MetLife's conversion of ERISA plan death benefits violates ERISA because MetLife is a fiduciary and a party in interest as defined by 29 U.S.C. §§ 1002(14), (21), and the self-dealing inherent in its practices violates the duty of loyalty that ERISA imposes upon fiduciaries and violates several of ERISA's prohibited transaction rules.

## PARTIES, JURISDICTION AND VENUE

3.      Ms. Owens and Mr. Smith are residents and citizens of the State of Georgia, residing in the Gainesville Division of this Court.

4.      MetLife transacts business, through its agents and employees, in the Gainesville Division of the United States District Court for the Northern District

of Georgia. MetLife has offices and agents in the Gainesville Division of this Court, including, *inter alia*, offices at 3750 Agard Street, Cumming, Georgia 30040, and 124 Courtland Drive, Jefferson, Georgia 30549. MetLife is registered to do business in the State of Georgia and may be served with process by service upon its registered agent, CT Corporation System, 1201 Peachtree Street, N.E., Atlanta, GA 30361. MetLife is subject to the jurisdiction of this Court.

5. MetLife is incorporated under the laws of the State of New York with its principal place of business in New York City, New York. The amount in controversy in this action far exceeds $5,000,000.00. Ms. Owens, Mr. Smith and many members of the two Classes for whom this action is brought are citizens of states other than New York. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d). This Court also has subject matter jurisdiction pursuant to ERISA § 502(e)(1), 29 U.S.C.§ 1132(e)(1) and 28 U.S.C. § 1331, because this action involves claims brought by beneficiaries pursuant to ERISA § 502(a)(3), 29 U.S.C. §1132(a)(3) to obtain appropriate equitable relief to redress MetLife's violations of ERISA's fiduciary standards and prohibited transaction rules.

6. Venue lies in the Gainesville Division of this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because, among other things, MetLife

may be found within the district, as it has offices and agents in the Gainesville Division.

## METLIFE'S HANDLING OF
## MS. OWENS' LIFE INSURANCE CLAIM

7.     Ms. Owens' husband Robert F. Owens was a resident of Georgia, employed by CB Richard Ellis, Inc., with his office in this district, and was a participant in the CB Richard Ellis Group Insurance Plan ("CBRE Plan") from September 12, 2005 until his death on April 7, 2012.

8.     The CBRE Plan provides life insurance benefits through an insurance policy issued by MetLife ("CBRE Policy").

9.     The CBRE Plan and Policy provided $95,000 in Basic Life coverage on Mr. Owens' life.  Ms. Owens is the beneficiary of that coverage.

10.     The CBRE Policy's payment clause provides "We will pay the Life Insurance in one sum.   Other modes of payment may be available upon request."

11.     CB Richard Ellis submitted a claim for life insurance benefits to Metlife on Ms. Owens' behalf on or about May 21, 2012.

12.     MetLife approved the claim, but did not pay the life insurance benefits to Ms. Owens in one sum or give Ms. Owens any choice concerning the

mode of payment. Instead, MetLife informed Ms. Owens that her life insurance proceeds had been "paid" to her through the "Total Control Account (TCA) Settlement Option" ("TCA"), and issued her a book of blank drafts that she could use to draw on the funds in increments of $250 or more.  By doing so, MetLife exercised its control over the ERISA plan benefits due Ms. Owens and loaned those death benefits to itself, holding Ms. Owens' death benefits in its general account.

## MR. SMITH'S LIFE INSURANCE CLAIM

13.    Mr. Smith's grandmother, Betty J. Savage, was a participant in an ERISA-governed employee benefit plan ("Plan") at the time of her death.

14.    The Plan provides life insurance benefits through an insurance policy issued by MetLife ("Policy").

15.    The Plan and Policy provided life coverage on Ms. Savage's life. Mr. Smith is a beneficiary of that coverage in the amount of $6,500.00.

16.    The Policy's payment clause provides "We will pay the Life Insurance in one sum.  Other modes of payment may be available upon request." However, unlike the Owens Policy, this Policy also stated in an amendment to the policy, "We may pay the full benefit amount: . . . 2. by establishing an account that

earns interest and provides the Beneficiary with immediate access to the full benefit amount."

17.    A claim was submitted for life insurance benefits to MetLife on Mr. Smith's behalf.

18.    MetLife approved the claim, but did not pay the life insurance benefits to Mr. Smith in one sum. Instead, MetLife informed Mr. Smith that his life insurance proceeds had been "paid" to him through the "Total Control Account (TCA) Settlement Option" ("TCA"), and issued him a book of blank drafts that he could use to draw on the funds in increments of $250 or more.  By doing so, MetLife exercised its control over the ERISA plan benefits due Mr. Smith and loaned those death benefits to itself, holding Mr. Smith's death benefits in its general account.

## METLIFE'S RETENTION OF PLAINTIFFS' DEATH BENEFITS

19.    MetLife set the interest rate that it would accrue on the debts it owed Ms. Owens and Mr. Smith at a rate that would float weekly to equal or exceed one of two indices, but with the annual effective interest rate no lower than 0.50%.

20.    MetLife reserved the right to unilaterally change the terms governing the debts it owed to Ms. Owens and to Mr. Smith, except for the minimum rate,

beginning six (6) months after the debt was incurred.

21.     When MetLife lends to itself the death benefits due its beneficiary, it holds the beneficiary's death benefits in its general account until it is called upon by the bank that provides draft-clearing services for MetLife to transfer funds to that bank to cover drafts drawn on the unfunded "Total Control Account." In the interim, MetLife invests the beneficiary's funds and keeps for itself the difference or "spread" between the amount it accrues by self-dealing in its beneficiary's funds and the amount of interest it credits to its beneficiary.

22.     MetLife credited interest on the unpaid death benefits owed to Ms. Owens and Mr. Smith at the rate of .50%.  MetLife gained far more than 0.50% by investing their life insurance benefits for its own account.

23.     MetLife did not disclose to Ms. Owens or to Mr. Smith the amount of profit that it reaped from the spread between the amount it gained by investing their benefits for its own account and the amount of interest it credited to them.

24.     Upon information and belief, MetLife did not disclose to the Plans' sponsors or administrators of the Plans the profits that it expected to accrue and did accrue from the spread between the amount it gained investing Ms. Owens' and Mr. Smith's benefits and the benefits of other ERISA beneficiaries for its own

account and the amount of interest it credited to the beneficiaries on the unpaid death benefits that it owed to them.

## METLIFE'S PRACTICES GENERALLY

25.   At all times relevant to this action, MetLife sold group life insurance policies ("Policies") similar to the Policies that it sold to the Plans to other ERISA-governed employee welfare benefit plans ("Plans").

26.   The payment clauses in these Policies provide "We will pay the Life Insurance in one sum.  Other modes of payment may be available upon request." Some also included language permitting settlement of claims by providing a retained asset account.

27.   When MetLife approves claims for death benefits due under these Policies in amounts that exceed a certain threshold, MetLife does not pay the benefits in one sum or give the beneficiaries any choice concerning the mode of payment. Instead, MetLife loans the plan benefits to itself and handles their claims in the same way that it handled the claims of Ms. Owens and Mr. Smith.

28.   When MetLife loans the ERISA plan death benefits to itself, it holds these borrowed funds in its general account until it is called upon by the bank that provides draft-clearing services for MetLife to transfer funds to the bank to cover

drafts drawn on the debts it owes to ERISA plan beneficiaries. In the interim, MetLife invests the beneficiaries' funds and keeps for itself the spread between the amount it gains by investing the beneficiaries' funds and the amount of interest it credits to the beneficiaries.

29.    Upon information and belief, MetLife does not disclose to the Plans' sponsors, administrators or beneficiaries the amount of profit it realizes from its investments of funds that it owes ERISA plan beneficiaries, nor does it negotiate with the Plans in advance as to the amount of profit that it will retain.

30.  MetLife's practice of lending to itself death benefits due ERISA plan beneficiaries, with an empty interest-bearing "account" established for the beneficiary at a bank and the beneficiary being issued a book of blank drafts with which to draw on the claim proceeds through the "account" is a practice that was devised by a former MetLife executive named Gerry Goldsholle in order to allow MetLife to "hold onto death benefits" that it otherwise would have to pay out so that MetLife could continue to invest the funds for its own enrichment and "make a nice spread on the money":

> "I looked at this and said this is crazy," says Goldsholle...."What are we doing to retain some of this money?  It's very expensive to bring money in the front door of an insurance company.  You're paying very large commissions and sales expenses."

-9-

So ... [he] came up with a way for MetLife to hold onto death benefits.

"The company would win because we would make a nice spread on the money," Goldsholle says, while customers would earn interest on their accounts.  MetLife, he says, can earn 1 to 3 percentage points more from its investment income – mostly from bonds – than it pays out to survivors.

31.    This practice by which MetLife lends plan assets due beneficiaries to itself is profitable for MetLife.  According to Goldsholle, "MetLife makes $100 million to $300 million a year from investment returns on the death benefits it holds." *Id.*

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

32.    On November 21, 2013, Ms. Owens submitted her claim to MetLife via overnight mail.

33.    The ERISA addenda to the Plan's Certificates of Insurance state that MetLife will review claims and notify claimants of its decision on their claims within a reasonable period, not to exceed 90 days from the date MetLife receives the claim, unless MetLife notifies the claimant that there are special circumstances requiring an extension of time of up to an additional 90 days.

34.    MetLife neither notified Ms. Owens of its decision on her claim nor

requested additional time to respond to the claim.

## **METLIFE'S FIDUCIARY STATUS**

35.    Under ERISA § 3(21)(A), a person is a fiduciary with respect to a

plan to the extent:

> (i) he exercises any discretionary authority or discretionary control
> respecting management of such plan or exercises any authority or
> control respecting management or disposition of its assets, ... or (iii)
> he has any discretionary authority or discretionary responsibility in
> the administration of such plan.

29 U.S.C. § 1002(21)(A)(i), (iii).

36.    The actions subject to complaint in this case include MetLife's

decision to lend ERISA plan death benefits to itself, memorializing these debts

with an unfunded account that it euphemistically calls a "Total Control Account"

instead of paying to beneficiaries their death benefits in one sum, and MetLife's

decisions to invest the beneficiaries' benefits for its own account and keep for

itself most of the resulting gain.

37.    MetLife functioned as a fiduciary when it took the actions subject to

complaint for three independent reasons.

38.    First, MetLife had discretionary authority to take the actions pursuant

to the terms of its Policy, which gave MetLife "discretionary authority to interpret

the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan[,]" thus rendering MetLife a fiduciary under ERISA § 3(21)(A)(iii).

39.     Second, MetLife exercised discretionary authority and control in the management of the Plans when it took the actions subject to complaint because the actions were not compelled by the terms of the Policies, thus rendering MetLife a fiduciary under the first clause of subsection (i) of ERISA § 3(21)(A).

40.     Third, the Policies and the death benefits provided by the Policies are assets of the Plans, and MetLife exercised authority and control over these assets when it took the actions subject to complaint, thus rendering MetLife a fiduciary with respect to the actions pursuant to the second clause of subsection (i) of ERISA § 3(21)(A).

## METLIFE'S STATUS AS A PARTY IN INTEREST

41.     "The term 'party in interest' means as to an employee benefit plan – (A) any fiduciary ... [and] (B) a person providing services to such plan[.] ERISA § 3(14), 29 U.S.C. § 1002(14).

42.     MetLife is a party in interest pursuant to subsection (A) because it is a fiduciary for the reasons stated above.

43.     MetLife is a party in interest pursuant to subsection (B) because it

provided services to the Plans by, *inter alia*, issuing the Policies to the Plans and

administering claims due under the Policies.

## CLASS ACTION ALLEGATIONS

### The Owens Class

44.     Ms. Owens brings this action as a class action on behalf of herself

and all members of a class that includes:

> All life insurance beneficiaries of ERISA-governed employee benefit
> plans that were insured by group life insurance policies issued by
> MetLife that provide for payment in "one sum" for whom MetLife
> established a "Total Control Account" between April 18, 2008, and
> December 31, 2012.    Expressly excluded from the class are
> beneficiaries under policies that, at the time of the insured's death,
> contained the statement in the policy certificate or an endorsement to
> the policy certificate that expressly states that claims for benefits can
> be settled "by establishing an account that earns interest."

This class is referred to as the Owens Class.

45.     **Numerosity**.   Upon information and belief, the Owens Class

includes tens of thousands of members.   Joinder of all class members is

impractical.

46.     **Commonality**.   There are questions of law and fact common to the

Owens Class, including without limitation:

a.      Whether MetLife engaged in the actions subject to complaint;

b.      Whether MetLife was functioning as a fiduciary under ERISA §
3(21)(A) when it engaged in the actions subject to complaint;

c.      Whether MetLife is a "party in interest" within the meaning of
ERISA § 3(14);

d.      Whether the actions subject to complaint violate ERISA §§
404(a)(1)(A), 406(a)(1)(B), 406(a)(1)(C), and/or 406(b)(1);

e.      The amount by which MetLife was unjustly enriched through the
actions subject to complaint; and

f.      The equitable relief that is appropriate to redress the actions subject
to complaint, including whether MetLife should be ordered to disgorge the profits
it has reaped through those actions.

47.     **Typicality.** Ms. Owens' claim is typical of the claims of the members
of the Owens Class.   All of the claims are based on the same facts, practices and
legal theories.

49.     **Adequacy of Representation.**   Ms. Owens and her counsel will
fairly and adequately represent the interests of the members of the Owens Class.
Ms. Owens has no interests that conflict with the interests of the members of the

-14-

Owens Class, and her attorneys possess the experience, expertise and resources necessary to prosecute this action as a class action.

49.   **Predominance.** The questions of law and fact common to class members predominate over any questions affecting only individual class members.

50.   **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy in this case, considering: (a) prosecution of separate actions by individual class members would not be efficient or economically feasible due to the modest amount in controversy for individual class members; (b) the absence of any other pending litigation involving the claims asserted in this action; (c) the desirability of concentrating this action in this forum; and (d) the absence of any foreseeable difficulties in managing this action as a class action.

### The Smith Class

51.   Mr. Smith brings this action as a class action on behalf of himself and all members of a class that includes:

> All life insurance beneficiaries of ERISA-governed employee benefit plans that were insured by group life insurance policies issued by MetLife that provide for payment in "one sum" for whom MetLife established a "Total Control Account" (a) between January 1, 2013 and March 31, 2019; and (b) between April 18, 2008 and December 31, 2012 for all policies that, at the time of the insured's death,

contained the statement in the policy certificate or an endorsement to the policy certificate that expressly states that claims for benefits can be settled "by establishing an account that earns interest."

This class is referred to as the Smith Class.

52.     **Numerosity**.   Upon information and belief, the Smith Class includes over 100,000 members.   Joinder of all class members is impractical.

53.     **Commonality**.   There are questions of law and fact common to the Smith Class, including without limitation:

a.      Whether MetLife engaged in the actions subject to complaint;

b.      Whether MetLife was functioning as a fiduciary under ERISA § 3(21)(A) when it engaged in the actions subject to complaint;

c.      Whether MetLife is a "party in interest" within the meaning of ERISA § 3(14);

d.      Whether the actions subject to complaint violate ERISA §§ 404(a)(1)(A), 406(a)(1)(B), 406(a)(1)(C), and/or 406(b)(1);

e.      The amount by which MetLife was unjustly enriched through the actions subject to complaint; and

f.      The equitable relief that is appropriate to redress the actions subject to complaint, including whether MetLife should be ordered to disgorge the profits

-16-

it has reaped through those actions.

54.    **Typicality.** Mr. Smith's claim is typical of the claims of the members of the Smith Class.  All of the claims are based on the same facts, practices and legal theories.

55.    **Adequacy of Representation.**  Mr. Smith and his counsel will fairly and adequately represent the interests of the members of the Smith Class.   Mr. Smith has no interests that conflict with the interests of the members of the Smith Class, and his attorneys possess the experience, expertise and resources necessary to prosecute this action as a class action.

56.    **Predominance.** The questions of law and fact common to class members predominate over any questions affecting only individual class members.

57.    **Superiority.**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy in this case, considering: (a) prosecution of separate actions by individual class members would not be efficient or economically feasible due to the modest amount in controversy for individual class members; (b) the absence of any other pending litigation involving the claims asserted in this action; (c) the desirability of concentrating this action in this forum; and (d) the absence of any foreseeable difficulties in

managing this action as a class action.

## COUNT 1

### VIOLATION OF ERISA § 404(a)(1)(A)

58.    Paragraphs one through fifty-seven are realleged and incorporated into Count 1.

59.    ERISA § 404(a)(1)(A) requires ERISA fiduciaries to discharge their duties with respect to ERISA plans "solely in the interests of the participants and beneficiaries" and "for the exclusive purpose of providing benefits to participants and their beneficiaries."    29 U.S.C. § 1104(a)(1)(A).    The duty of loyalty imposed by this provision is the highest known to law.

60.    MetLife breached its duty of loyalty to Ms. Owens, Mr. Smith and the members of both Classes by borrowing their benefits, investing the funds for its own account, and keeping for itself most of the resulting gain.

61.    As a direct and proximate result of MetLife's disloyalty, MetLife has been unjustly enriched in an amount equal to all profit obtained by MetLife on the borrowed death benefits.

62.    Ms. Owens, Mr. Smith and all members of both Classes are entitled to surcharge in equity compelling MetLife to disgorge all profit it realized from

self-dealing in their death benefits.

63.    Ms. Owens, Mr. Smith and all members of both Classes are entitled to recover expenses of litigation, including reasonable attorney fees.

64.    Ms. Owens, Mr. Smith and all members of both Classes are entitled to prejudgment interest on the funds subject to disgorgement.

## COUNT 2

## VIOLATION OF ERISA § 406(b)(1)

65.    Paragraphs one through fifty-seven are realleged and incorporated into Count 2.

66.    ERISA § 406(b)(1) prohibits ERISA fiduciaries from dealing with the assets of ERISA plans in their own interest or for their own account. 29 U.S.C. § 1106(b)(1).

67.    Pursuant to ERISA § 401(b)(2), 29 U.S.C. § 1101(b)(2), the Policies purchased by the Plans are assets of the Plans or "Plan Assets."

68.    The death benefit proceeds of the Policies are Plan Assets until actual possession of the proceeds is transferred by MetLife to the beneficiary or the beneficiary's payee.

69.    MetLife dealt with the Policies and the death benefit proceeds of the

Policies in its own interest and for its own account by lending to itself the benefits it owed Ms. Owens, Mr. Smith and members of both Classes, investing the retained funds for its own account, and keeping for itself the resulting profits.

70.     Ms. Owens, Mr. Smith and all members of both Classes are entitled to surcharge in equity compelling MetLife to disgorge all profit it realized from self-dealing in their death benefits.

71.     Ms. Owens, Mr. Smith and all members of both Classes are entitled to recover expenses of litigation, including reasonable attorney fees.

72.     Ms. Owens, Mr. Smith and all members of both Classes are entitled to prejudgment interest on the funds subject to disgorgement.

## COUNT 3

### VIOLATION OF ERISA § 406(a)(1)(B)

73.     Paragraphs one through fifty-seven are realleged and incorporated into Count 3.

74.     ERISA § 406(a)(1)(B) provides:

**§ 1106. Prohibited transactions**

**(a) Transactions between plan and party in interest**

Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect--

(B) lending of money or other extension of credit between the plan and a party in interest;

29 U.S.C. § 1106(a)(1)(B).

75.     Pursuant to ERISA § 401(b)(2), 29 U.S.C. § 1101(b)(2), the Policies purchased by the Plans are assets of the Plans or "Plan Assets."

76.     The proceeds of the Policies are Plan Assets until actual possession of the proceeds is transferred to the beneficiary or the beneficiary's payee.

77.     MetLife used its power as a plan fiduciary and as a party in interest to take the plan assets generated to pay death benefits and to lend these plan assets to itself, thereby becoming a debtor of the plan beneficiaries.  In doing so, MetLife engaged in transactions prohibited by 29 U.S.C. § 1106(a)(1)(B).

78.     MetLife has been unjustly enriched by its violations of 29 U.S.C. § 1106(a)(1)(B) in an amount equal to all profit that it has realized from its investment of these plan benefits that it lent to itself.

79.     Ms. Owens, Mr. Smith and all members of both Classes are entitled to surcharge in equity compelling MetLife to disgorge all profit it realized from self-dealing in their death benefits.

80.    Ms. Owens, Mr. Smith and all members of both Classes are entitled to recover expenses of litigation, including reasonable attorney fees.

81.    Ms. Owens, Mr. Smith and all members of both Classes are entitled to prejudgment interest on the funds subject to disgorgement.

## COUNT 4

## VIOLATION OF ERISA § 406(a)(1)(C)

82.    Paragraphs one through fifty-seven are realleged and incorporated into Count 4.

83.    ERISA § 406(a)(1)(C) provides:

Except as provided in section 1108 of this title: (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect– ... (C) furnishing of ... services ... between the plan and a party in interest.

ERISA § 406(a)(1)(C); 29 U.S.C. § 1106(a)(1)(C).

84.    ERISA § 408(b)(2) provides relief from the foregoing prohibition for service contracts or arrangements between a plan and a party in interest if the contract or arrangement is reasonable, the services are necessary for the establishment and operation of the plan, and no more than reasonable compensation is paid for the services. 29 U.S.C. § 1108(b)(2).

85. MetLife furnished services to the Plans, including insuring the Plans' obligations to provide life insurance benefits to qualified beneficiaries and administering claims for death benefits due under the Plans.

86. The transactions in which MetLife agreed to furnish services to the Plans are prohibited by ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), unless they are exempt under ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2).

87. The transactions are not exempt under ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2) because MetLife received more than reasonable compensation for its services through its self-dealing in the death benefits of ERISA plan beneficiaries.

88. MetLife received more than reasonable compensation for its services because: (a) it controlled how much compensation it would receive from its investment of death benefits *via* its control over how the funds it retained were invested and how the resulting earnings were apportioned between itself and the beneficiaries, and (b) upon information and belief, the income that MetLife derived from the spread was not disclosed to, negotiated with, or approved by, responsible plan fiduciaries.

89. Ms. Owens, Mr. Smith and all members of both Classes are entitled to surcharge in equity compelling MetLife to disgorge all profit it realized from

-23-

self-dealing in their death benefits.

90.    Ms. Owens, Mr. Smith and all members of both Classes are entitled to recover expenses of litigation, including reasonable attorney fees.

91.    Ms. Owens, Mr. Smith and all members of both Classes are entitled to prejudgment interest on the funds subject to disgorgement.

## **PRAYER FOR RELIEF**

WHEREFORE, having stated their First Amended Complaint, Plaintiffs pray as follows:

a)    that process issue and that MetLife be served with process in accordance with applicable law;

b)    that the case be certified to proceed as class actions pursuant to Fed. R. Civ. P. 23(a) and (b)(3), and that Ms. Owens and her attorneys be appointed to represent the Owens Class as certified by the Court, and that Mr. Smith and his attorneys be appointed to represent the Smith Class as certified by the Court;

c)    that the Court inquire into this matter and find that MetLife has violated ERISA in the ways alleged by Plaintiffs and has been unjustly enriched thereby;

d)    that the Court award Ms. Owens, Mr. Smith, and members of both

-24-

Classes appropriate equitable relief to redress MetLife's violations of ERISA, including disgorgement of the profits that MetLife reaped through the violations;

e)    that Ms. Owens, Mr. Smith, and members of both Classes recover prejudgment and post-judgment interest at the maximum rates permissible at law or in equity;

g)    that Ms. Owens, Mr. Smith, and members of both Classes recover attorney's fees, costs and other recoverable expenses of litigation;

h)    that Ms. Owens, Mr. Smith, and members of both Classes recover such other and further relief that the Court deems appropriate.

Respectfully submitted,

*s/ John C. Bell, Jr.*
John C. Bell, Jr.
Georgia Bar No.   048600

*s/ Lee W. Brigham*
Lee W. Brigham
Georgia Bar No.   081698
BELL & BRIGHAM
Post Office Box 1547
Augusta, Georgia 30903-1547
(706) 722-2014 p
john@bellbrigham.com
lee@bellbrigham.com

-25-

Jason J. Carter
Georgia Bar No. 141669
Michael B. Terry
Georgia Bar No. 702582
Bondurant, Mixson & Elmore, LLP
3900 One Atlantic Center
1201 W. Peachtree Street
Atlanta, GA 30309
(404) 881-4100 p
carter@bmelaw.com
terry@bmelaw.com

Wm. Gregory Dobson
Georgia Bar No. 237770
LOBER & DOBSON, LLC
PO Box 887
LaFayette, GA 30728
(478) 745-7700 p
wgd@lddlawyers.com

Michael J. Lober
Georgia Bar No. 455580
LOBER & DOBSON, LLC
3140 Overland Drive
Roswell, GA 30075
(678) 461-9800 p
mjlober@bglawgroup.net

John W. Oxendine
Georgia Bar No. 558155
4370 Peachtree Road, NE
Atlanta, GA 30319
(404) 734-5738 p
jwolaw@gmail.com

Todd L. Lord
Georgia Bar No. 457855
PO Box 901
Cleveland, GA 30528
(706) 219-2239 p
attytllord@windstream.net

COUNSEL FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of **FIRST AMENDED COMPLAINT – CLASS ACTION** to be served upon opposing counsel on this ___ day of July, 2019, via electronic mail.

*s/ John C. Bell, Jr.*_____
COUNSEL FOR PLAINTIFFS